HUNTINGTON BRANCH, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, Housing Help, Inc., Mabel Harris, Perrepper Crutchfield, and Kenneth L. Cofield, Plaintiffs,

v.

The TOWN OF HUNTINGTON, NEW YORK, Kenneth C. Butterfield, Claire Kroft, Kenneth Deegan, Edward Thompson, and Joseph Clemente, Defendants.

No. CV–81–0541.

United States District Court, E.D. New York.

Sept. 9, 1987.

Richard F. Bellman, Steel Bellman & Levine, P.C., New York City, Charles F. Sanders, Nat. Ass'n for the ·Advancement of Colored People, Brooklyn, N.Y., for plaintiffs.

Richard C. Cahn, Cahn Wishod Wishod & Lamb, Melville, N.Y., for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

The complaint in this housing discrimination action was filed on February 23, 1981. Two of the claims from the initial complaint survive: (1) plaintiffs allege that the Town of Huntington, New York has violated title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, as well as the fourteenth amendment's equal protection clause and 42 U.S.C. §§ 1982 and 1983, by (a) restricting private construction of multi-family housing units to an urban renewal area and (b) refusing to take action to provide multi-family zoning for the Matinecock Court development proposed by plaintiff Housing Help, Inc.; (2) plaintiffs also allege that the denial of multi-family zoning violates N.Y. Town Law § 261 (McKinney 1987), as construed in *Berenson v. Town of New Castle,* 38 N.Y.2d 102, 341 N.E.2d 236, 378 N.Y.S.2d 672 (1975).

The complaint also named as defendants the United States Department of Housing and Urban Development and its secretary. The federal defendants moved for judgment on the pleadings; the Huntington defendants moved to dismiss or for summary judgment. Holding that the plaintiffs lacked standing, the district court dismissed the complaint. *Huntington Branch NAACP v. Town of Huntington, New York,* 530 F.Supp. 838 (E.D.N.Y.1981).

The court of appeals reversed and remanded. 689 F.2d 391 (2d Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1983). The plaintiffs had not appealed the dismissal with respect to the federal defendants, *id.* at 393 n. 3, so the action proceeded against the Huntington defendants. After the ruling of the court of appeals, this action was reassigned to the undersigned.

On November 7, 1983, this court certified the case as a class action, with the class represented by plaintiffs defined as:

All black, Hispanic and lower income persons in need of lower cost housing opportunities in Huntington and surrounding areas and who would qualify for residency in the proposed Matinecock Court and other Section 8 projects in Huntington, and who seek to reside in and insure opportunity for racially and economically integrated housing in Huntington.

"Section 8" is a reference to a new construction housing program authorized by 42 U.S.C. § 1437f.

A defense motion to dismiss or for summary judgment was denied on May 13, 1984. The action was tried, without a jury, from May 28, 1985 through June 14, 1985.

## I. *Stipulations*

The parties have stipulated to the following facts. The 1980 census showed that the population of the Town of Huntington was 197,089, classified as follows: 187,794 whites, 6,183 blacks, 4,666 Hispanics, and 2,445 Asians. The census also showed that there were 51,793 families, classified as 49,662 white, 1,435 black, 1,073 Hispanic, and 542 Asian. Thus, Huntington's population was 3.35% black.

Certain HUD programs use "very low income" guidelines. These guidelines are set at approximately 185% of the poverty level.

In 1961 through 1963, as part of the "workable program" requirements of federal urban renewal statutes, and in coordination with the preparation of the Town's master plan, the Town's Planning Board caused various town-wide studies to be prepared to determine the condition of the available housing stock in the Town. The study identified 2,220 dwelling units that were termed inadequate and unsafe. The greatest concentration of these substandard dwelling units was in the area that subsequently became the urban renewal area. The study found 458 substandard housing units within a ½-mile radius of the Huntington railroad station. After the enactment of the Housing and Community Development Act of 1974 (HCDA), and based upon the findings of the 1961-63 study, the Town designated certain areas as community development areas (CDAs).

On March 4, 1964, the Town Board created the Public Housing District and rezoned the land upon which the public housing project known as Gateway Gardens is now located to the Public Housing District zoning classification.

In 1965, the Planning Board, pursuant to section 272-a of the New York Town Law, adopted a master plan for the Town. The master plan described, among other things, the decline in the Huntington Station area. It recommended slum clearance and redevelopment in that area, accompanied by provision of safe and adequate housing for displaced families. The master plan does not call for high density housing or multifamily dwellings at the intersection of Elwood and Pulaski Roads. The intersection of Elwood and Pulaski is where plaintiff Housing Help, Inc. (HHI) possesses an option to build.

On May 26, 1966, the Town Board, acting pursuant to title I of the Housing Act of 1949 and article 15 of New York's General Municipal Law, adopted a resolution approving an urban renewal plan involving

the acquisition of land in the project area; the demolition or removal of buildings and improvements; and the installation, construction or reconstruction of project improvements, to make land available for development or redevelopment by private enterprises or public agencies, as authorized by law and to carry out plans for a program of repair and rehabilitation of buildings or other improvements.

One of the Town Board's findings was that financial assistance under the provisions of Title I of the Housing Act of 1949, as

amended, is necessary to enable the land in the Project area to be renewed in accordance with the Urban Renewal Plan for the Project area and, accordingly, the filing by the Local Public Agency of an application or applications for such financial assistance under Title I is hereby approved.

On July 21, 1966, the Town Board conducted a public hearing to consider amendments to the Building Zone Ordinance that would add provisions for garden apartments and a retirement community district. A hearing on the proposed R–RM zoning (which covers senior citizen housing) was held on that date. The Town Board created the R–RM District in August 1966 and rezoned real property owned by Health Care Agencies of the New York Annual Conference of the Methodist Church, Inc. (the Methodist Church) to the new R–RM district in December 1966. The Methodist Church had applied for the zoning change to R–RM status.

The New York State Legislature established the Huntington Urban Renewal Agency, effective April 10, 1967, by enactment of chapter 222 of the laws of 1967. On June 6, 1967, the Town Board adopted a resolution approving Amendment No. 1 to the Urban Renewal Project, NYR–164. On November 25, 1969, the Town Board adopted Amendment No. 2 to the urban renewal plan, which contained a Neighborhood Design Concept Plan, providing for "an integrated residential and commercial development" with a proposed pedestrian bridge over New York Avenue. This plan also called for garden apartments and office and commercial development on the northeast corner of Broadway and New York Avenue. On June 3, 1969, the Town Board established the R–3M Garden Apartment District. In February 1969, the Town Board had adopted height, area, and bulk regulations applicable to the proposed R–3M district. On December 30, 1969, upon recommendation of the Planning Board, the Town Board rezoned to R–3M the land upon which Walt Whitman Village is now located, and the land upon which the Town in 1980 proposed a 150–unit section 8 development at the northeast corner of the intersection of Route 110 and Broadway in Huntington Station.

Acting under its statutory authority, the Huntington Urban Renewal Agency entered into an agreement on July 22, 1971 with a partnership known as Melville Industrial Associates (MIA). The purpose of the agreement was to secure development of three contiguous parcels (Redevelopment Parcels 2, 3, and 25) within the Urban Renewal Area for multi-family dwellings, as part of the Urban Renewal Redevelopment Plan.

On February 15, 1972, the Town Board rezoned certain property located on the south side of Pulaski Road from R–40 Residence District to R–RM Retirement Community District and C–5 Planned Shopping Center District, in order to facilitate the construction of 300 units of senior citizen housing that became Paumanack Village and a shopping center adjacent thereto. This rezoning was upon the application of Raval Associates and Senior Citizens Housing Committee of Huntington, Inc., and took place after a recommendation by the Planning Board and a public hearing of the Town Board.

On May 9, 1972 and May 25, 1973, pursuant to the July 22, 1971 agreement concerning Redevelopment Parcels 2, 3, and 25, the Urban Renewal Agency conveyed to MIA the three contiguous parcels situated at the northeast corner of the intersection of New York Avenue and Broadway.

On January 25, February 1, and March 1, 1977, the Town Board held public hearings with regard to the Town's 1977 Community Development Block Grant (CDBG) application. On January 14, 1978, the Town Board conducted a public hearing regarding the 1978–79 CDBG application, and, on February 27, 1979, the Town Board held a public hearing regarding the 1980 CDBG application.

On July 20, 1978, Michael Miness, the director of the Huntington Community Development Agency (CDA), sent a letter to the residents of Huntington Station in the vicinity of the Lincoln School, informing them of the proposed Lincoln School

project. On May 10, 1979, after a public hearing, the Planning Board approved the rezoning of the Lincoln School property to R–3M zoning, for the express purpose of constructing 30 units of section 8–assisted low income housing. The Lincoln School was situated outside the boundaries of the former urban renewal area of the Town, but inside an area that the Town had previously designated as a community development area. On June 5, 1979, the Town Board conducted a public hearing on the Lincoln School rezoning and publicly advertised the hearing. The CDA issued letters on June 5, 1979, advising the community of the Planning Board's recommendation for a change of zone of the Lincoln School property and of the impending zoning change. On June 26, 1979, the Town Board rezoned the Lincoln School property to R–3M.

On August 31, 1982, HHI's Board of Directors advised the CDA that it supported two-family construction in the East Fourth Street area only if the Town agreed to build one low income unit outside of the former urban renewal area for every unit built inside the area. On October 19, 1982, the Town Board decided not to agree to the conditions sought by HHI as a prerequisite for HHI's involvement in the project.

On June 2, 1980, the Town filed its application for preliminary approval of a proposed 150–unit section 8 project in tract 1110.02 in Huntington Station. A letter of that date from Town Supervisor Kenneth Butterfield to HUD requested pre-approval for an anticipated project of 150 to 175 housing units for families. In a letter dated July 10, 1980, Alan Weiner, HUD's Area Office Manager, notified Butterfield that HUD had preapproved section 8 funding for the 150–unit proposed low income housing project in Huntington Station. HUD pre-reserved $1,012,140 in fiscal year 1980 funds allocated to HUD's New York Area Office. As of the 1980 census, census tract 1110.02 had a population of 79.44% white, 17.02% black, 11% Hispanic, .17% Indian,

and 1.44% Asian. The total exceeds 100% because the category "Hispanic" includes persons also listed in the white and black categories. On December 12, 1980, HHI's executive director advised HUD by letter that the HHI board "feels that [HUD's approval of the proposed 150–unit project in Huntington Station] goes against certain HUD regulations." HHI reiterated this position at its January 15, 1981 meeting with HUD.

By motion dated May 22, 1981, plaintiffs moved this court for a preliminary injunction restraining any further action with respect to the granting of funds for or contributing to construction of the proposed 150–unit section 8 housing development in the former urban renewal area of Huntington and enjoining HUD to maintain the section 8 funds allocated for the project available "for an alternative, non-discriminatory section 8 development in the Town of Huntington." At that time, the only other pending application for a section 8 new construction project in the Town was HHI's proposed Matinecock Court project. On August 28, 1980, HHI filed its application for section 8 funding for the Matinecock Court project, pursuant to a June 19, 1980 Notice of Funding Availability (NOFA). This application was filed after a meeting on July 29, 1980 with HUD's Deputy Area Director, who had invited HHI to file for a funding allocation. On October 9, 1980, James R. Dunne, the Director of the CDA, reviewed HHI's application for section 8 assistance for the proposed Matinecock Court project. After listing a variety of problems he perceived with the application, he wrote:

> In conclusion, this office cannot recommend an affirmative response to the proposal submitted by Housing Help/National Housing Partnership based on the material reviewed due to the comments presented above.

The full text of Dunne's memorandum is reproduced in the margin.[1]

---

1. The memorandum stated:
   We have received a developer's proposal for a 162 unit garden apartment, family housing development, proposed for a site at the inter-

section of Pulaski Road and Elwood Road in East Northport section of the Town. The developer for this complex is a joint venture between Housing Help, Inc. of Huntington

On October 14, 1980, federal regulations obligated HUD to secure the comments of Supervisor Butterfield with regard to whether the Matinecock Court project was consistent with the Town's HAP. On December 9, 1980, Joan Flowers, President of the Concerned Citizens Association (CCA), transmitted letters of opposition regarding Matinecock Court to the Supervisor and the Town Board. On January 6, 1981, at a public hearing of the Town Board, Flowers, as President of the CCA, publicly opposed the Matinecock Court project. Also on January 6, the Town Board adopted a resolution stating that the Matinecock Court site was inappropriate for senior citizen housing. On March 2, 1981, the CCA wrote to HUD describing the community's negative reaction to the Matinecock Court project.

On April 17, 1984, HUD approved the Town's housing assistance plan (HAP) for 1982–85, which provided for 150 new, or substantially rehabilitated, housing units and 100 existing section 8 certificates. On August 31, 1984, HUD approved the Town's fiscal year 1983 CDBG submission with an entitlement amount of $1,342,000. On the same date, HUD advised the Town that additional CDBG funds of $289,000 were approved under provisions of the Jobs Bill.

Plaintiff Huntington Branch, NAACP, is a branch of the NAACP, a national organization with over 1700 branches. Huntington Branch, NAACP is governed by the constitution, by-laws, and policies of the national office.

On May 27, 1980, the Town Board adopted a resolution directing the Planning Board to conduct a study of housing needs of "resident senior citizens and the youth of the Township." On August 26, 1980, when only preliminary data from the 1980 census was available, the Town Board adopted a resolution extending the time for the Planning Board to complete its housing study, to January 1, 1981, or a reasonable time thereafter.

and National Housing Partnership of Washington, D.C.

The proposed development contemplates a total of 162 subsidized units under the Section 8 Housing Assistance Program with tenants getting rent assistance through the Section 8 Program. Plans for the project show 32—1 Bedroom units, 83—2 Bedroom units, 35—3 Bedroom units and 12—4 Bedroom units.

This office has reviewed this proposal and hereby submits the following comments:

—The approved Housing Assistance Plan, both the Three Year Goal submitted with the CDBG 1979–80 Application and the Annual Goal submitted with the CDBG 1980–81 Application contain no "New Construction" units as a program goal. In order to accommodate said program proposal, both Three Year and Annual HAP Goals will have to be amended in accordance with HUD regulations.

—The plan for development cannot be carried out within the existing single family R–40 (1 acre).

—The development is located at the intersection of two heavily trafficked streets.

—The site plan presents a poor parking plan in terms of location with respect to the units, substandard in size and the lack of streets results in very poor fire protection access.

—The development is located adjacent to both the Long Island Railroad as well as a LILCO Substation. This is in addition to the heavy traffic conditions.

—The site plan shows recreation and/or play areas very inadequate for the number and type of dwelling units being proposed.

—The one and two-bedroom units are adequate in terms of size and layout.

—The three and four bedroom units are quite undersized; have a poor layout; bedrooms are much too small; living space is unrealistic; no storage; one full and two half baths for family of 6 to 8 is not realistic.

In conclusion, this office cannot recommend an affirmative response to the proposal submitted by Housing Help/National Housing Partnership based on the material reviewed due to the comments presented above.

In addition, this proposal cannot be achieved without the Housing Assistance Plan being amended. Said HAP is scheduled for amendment if the U.R. Project is to be developed and amending it for this proposal could adversely affect the feasibility and timing of the plans to develop the U.R. Project. Therefore, I cannot recommendan [sic] affirmative approval to this proposal as it stands now.

Attached is a letter received for Suffolk County relative to this project. Since the answer to HUD should be consistant [sic] with the County, request is hereby made to answer this letter directly.

The "U.R. Project" referred to in Dunne's memorandum is an urban renewal project. The attached letter referred to in the final paragraph of the memorandum was dated September 12, 1980, and was addressed to Suffolk County Executive Peter F. Cohalan by HUD's Area Manager, Alan H. Wiener.

Housing deterioration in Huntington is disproportionately in the areas of minority concentration and particularly in and around the Huntington Station area and surrounding the former urban renewal area. Gateway Gardens was established in Huntington Station by action of the Town Board, and was the first public housing project in Suffolk County.

The Town of Huntington executed cooperation agreements or amendments thereto with the Town of Huntington Housing Authority (HHA) on December 3, 1960, November 27, 1963, June 2, 1977, and September 14, 1984. On September 14, 1984, the Town Board authorized execution of a cooperation agreement with HHA relative to HHA's application for seventy-five units of public housing under the conventional construction program, and such an agreement was executed by the Supervisor promptly thereafter.

A 150–unit section 8–assisted low income project proposed in 1980 and 1981 for Huntington Station was to be located in the Huntington Union Free School District. The Huntington NAACP opposed the proposed project. The Huntington Union Free school District was under a 1972 desegregation order of the New York Commissioner of Education, which required it to submit a plan for school attendance zones that would achieve racial integration in each of the elementary schools of the district commencing in the 1973–74 school year, and thereafter. The Commissioner provided additional time "to allow the full effect of the urban renewal project currently under construction in Huntington Station to be known and to be taken into account." The Commissioner retained jurisdiction of the matter to assure further compliance.

Plaintiff Kenneth L. Cofield is black and has a wife and four children. When he first moved to Huntington, he obtained housing for himself, his wife, and two children in Whitman Village. During the time he lived in Whitman Village, Cofield was employed by the Town of Huntington Sanitation Department. He later lost his job because of lateness; he and his family then moved in with his mother-in-law on Acade-

my Place and paid no rent. Later, Cofield's wife and children moved into a private residence at 56 Sixth Street in Huntington Station, for which Kenneth Cofield did not pay any part of the rent. After the landlord at 56 Sixth Street sold the residence, Mrs. Cofield and her children moved back to her mother's house, while Kenneth Cofield stayed with his mother in Glen Cove. Later, Kenneth Cofield moved into a house on Ontario Street with his wife and children. The realtor, Pius Realty, advised him that it was possible for him to get a section 8 certificate, which he did obtain. In March 1984, he was paying $229 per month in rent for the Ontario Street residence; the government subsidy was approximately $468 per month.

From approximately 1971 or 1972 until 1979, plaintiff Perrepper Crutchfield lived at 13 Nixon Court in Homestead Village, Coram, New York. The apartment was a HUD-funded three-bedroom duplex for which she paid $295 per month in rent. From approximately December 1979 until December 1982, except for two or three months, Crutchfield resided at 65 Carr Lane in Coram, which, at the time, was a private residence owned by her parents. Crutchfield paid her mother $300 per month in rent. Crutchfield was a trainee and later an employee of the State University of New York at Stony Brook as a medical technician for approximately ten years. When she left Stony Brook, she was earning $12,500 per year. In 1978, Crutchfield began employment as a medical technician at the Northport Veterans Administration Hospital at a starting salary of $9,000 per year. As of October 1983, she remained employed at the Northport VA and was earning a salary of $17,500 per year. In December 1982, Crutchfield moved into Apartment 106 at Lincoln Manor. As of October 1983, she lived there with her two daughters, one of whom was twenty-five years of age. As of October 1983, Crutchfield was paying $351 per month in rent for a two-room apartment. The apartment is very well kept and very clean. Crutchfield would prefer a three-bedroom apartment. As of October 1983, Crutchfield did not pay for garbage pick-up

or water; she paid an electric bill of approximately $50 to $60 every two months.

The Town of Huntington has participated in the federal Housing and Community Development Program since its inception in 1975, and has received CDBGs from HUD on an annual basis. A HAP is a document that must be submitted to HUD by a community applicant in conjunction with a request for CDBG funds, which are used for community development activities and may not themselves be used to build low income housing or to provide rent subsidies for newly constructed low income housing. When a community applies for CDBG funds, it must submit a three-year HAP specifying the community's housing needs and conditions and setting goals for the provision of housing assistance in the community during the three-year period covered by the HAP. The HAP must include goals for the number and types of units to receive HUD assistance. If a community does not submit to HUD a satisfactory three-year HAP, its CDBG application cannot be approved. Among the goals with respect to numbers and types of units that a community must set forth in its HAP are the goals for the creation of housing units through HUD's Substantial Rehabilitation and New Construction Programs.

Huntington was approved for CDBG funds for the program year beginning July 16, 1978 in the amount of $1,591,000. An attachment to the official approval letter submitted to Huntington in connection with this grant stated: "This Office has serious concern with respect to provision of family renter units. In this regard, please see Item No. 20 of HUD Form 7082 for Special Contract Condition." The special condition imposed on this grant read as follows:

Notwithstanding any other provision of the Grant Agreement, the applicant by July 30th, 1978 shall provide evidence satisfactory to the Department that positive and affirmative steps have been taken to insure implementation of the 100 units of Section 8 Substantial Rehabilitation for families contained in the FY '78 Housing Assistance Plan. Such evidence shall be no less than specific indications of meetings and consultations with developers, community groups, public bodies and all others necessary to enable the Town to proceed expeditiously with the development of these units. A specific timetable detailing how these units are to be developed shall be furnished this Office.

Failure to comply with this condition shall constitute cause for reduction of your Grant pursuant to applicable regulations including Section 570.913.

Huntington was approved for CDBG funds for the program year beginning July 16, 1980 in the amount of $1,814,000. An attachment to the official approval letter submitted to Huntington states: "Please be advised that this Office expects that you will take all positive and affirmative steps to implement housing proposals as may be submitted during the Program Year."

Huntington was approved for CDBG funds for the program year beginning July 16, 1981 in the amount of $1,743,000. An attachment to the official approval letter submitted to the Town states:

1. Your approved Housing Assistance Plan, does not make provision for new construction or substantial rehabilitation. While this may be realistic in view of the current and short term projected availability of funding for new construction and substantial rehabilitation, this Office nevertheless remains concerned about the provision of newly created assisted housing units in the Town of Huntington. Accordingly, in the event that financial resources were to become available during the Program Year, the Town is required to take all actions within its control to provide for the construction of 100 newly created units of new or substantially rehabilitated rental housing by household type consistent with and proportional to your established needs.

In order to meet this requirement, the Town shall submit to HUD an amended Housing Assistance Plan to accomodate [sic] such development reflecting provision of these units on a site or sites acceptable to HUD. Said Housing Assistance Plan shall be submitted within

60 days of receiving notice from HUD that such funding resources are available.

Failure to comply with this requirement may be cause for this Office to consider any and all actions available under the provisions of 24 C.F.R. 570.910 through 570.911.

Huntington was approved for CDBG funds for the program year beginning July 16, 1982 in the amount of $1,436,000. An attachment to the official approval letter states:

1. By letter dated 6/15/82 this Office has acknowledged your request of 6/3/82 to extend your Housing Assistance Plan (HAP) through 9/30/82 without change. In this regard please be advised that comments relating to said Housing Assistance Plan contained in our approval of your FY 1981 grant, under cover of 7/15/81, continue to remain fully applicable.

Huntington was approved for CDBG funds for the program year beginning July 16, 1984 in the amount of $1,342,000. An attachment to the official approval letter states:

1. The past performance of the Town in the provision of newly created assisted rental housing for families has been a major concern of the Department for several years. This concern resulted in the delay of the New York Office's approval of the Town's three-year and second-year annual Housing Assistance Plan (HAP) until the HAP provided for at least 75 family public housing units of new construction or acquisition with rehabilitation in non-minority impacted areas of the Town. These units are to be developed under the Public Housing or Section 8 Programs. The HAP was approved by HUD on April 17, 1984.

On July 13, 1984, the New York Office of HUD invited the Huntington Housing Authority to submit an application for the development of public housing projects for families. On July 17, 1984, this Office received an application from the Housing Authority for 75 family units under the Public Housing Program. The application package did not include the Cooperation Agreement or the certified copy of the Transcript of Proceedings containing the local Governing Body Resolution approving the Application for a Preliminary Loan. In addition, the documents submitted did not include the justification for new construction mentioned in the application.

The Town is required to cooperate with and provide assistance to the Housing Authority to insure the submission of these documents by September 14, 1984. Failure of the Town to act affirmatively in connection with these submissions would be cause for this Department to take action on the Town's FY '84 CDBG Award pursuant to 24 CFR Section 570.-911.

Huntington set forth low cost housing needs in the Town in the HAPs it submitted to HUD for the period of 1976 through 1978. Huntington set the owner household need at 800 units, of which 250 was a need of the elderly, 157 a need of small families and 393 a need of large families. Total renter household needs was set at 2217, of which the elderly need was 543 units, the small family need 1028 units and the large family need 646 units. A separate low cost housing need was set for persons expected to reside in Huntington. This need totaled 430 units, of which 112 was for elderly, 168 for small families, and 150 for large families.

Huntington's HAP for the period 1976–78 set goals for provision of lower cost housing through a variety of HUD programs. This HAP set a goal for 400 new units under the section 8 new construction program with 292 of the units for elderly and 108 of the units for families. A goal of 50 units was set to be obtained through the Section 8 substantial rehabilitation program, all of the units to be for families. A goal of 100 units was set for other rehabilitation to create renter units under the section 312 program,[2] with all of the units

---

2. The section 312 program for housing rehabilitation loans is set forth in 42 U.S.C. § 1452b, as amended.

slated for families. A 200–unit goal was set through use of loans and grants from the community development funds and banks, with all of the units slated for families. A goal of 50 units was set by use of the existing section 8 program with 15 of the units for the elderly and 35 for families. Another 100–unit goal was set to be accomplished through rehabilitation assistance to homeowners or prospective homeowners with loans and grants from community development funds. All of these units were to be for families. Finally, a goal of 50 units was set to be met by other rehabilitation to homeowners under the section 312 program, with all the units slated for families.

The Town's revised HAP for the period 1979–82 set an assistance need for owner households totaling 666 units, of which 271 were for elderly households, 278 for small family households, and 117 for large family households. This HAP also set a total assistance need for renter households at 2793 units, of which 739 were for elderly households, 1627 for small family households, and 427 for large family households.

The 1979–82 HAP set a goal to meet the needs of lower income homeowners through rehabilitation assistance for 150 units under the HUD CDBG and section 312 programs, with 62 of these units for the elderly and handicapped and 88 for families. The needs of lower income renters were responded to by the setting of a goal for providing assistance for prospective homeowners through use of an "innovative" program for 20 family units and the use of an FHA/acquisition/resale program for 30 family units. The HAP also called for establishing new rental family units through another "innovative" program. The HAP also set a goal of rehabilitation of 250 rental units, 53 for elderly and handicapped persons and 197 for families. With respect to the goal for rehabilitation, the HAP stated that 50 units (three elderly and handicapped and 47 family) would be assisted through CDBG funds, 100 units (25 elderly and handicapped and 75 family) would be provided through the section 8 substantial rehabilitation programs, and 100 units (25 elderly and handicapped and 75 family) would be provided through section 8 existing and moderate rehabilitation programs. Finally, this HAP set a goal of assisting low income renters by securing 125 existing section 8 certificates, 25 for the elderly and handicapped and 100 for families.

Huntington's HAP for 1982 states that the rental subsidy needs of lower income households in the Town totals 3692 units, of which 930 (25.8%) is an elderly need, 2472 (66.9%) is a small family need, and 290 (7.9%) is a large family need.

Among the goals for meeting the needs set forth in the Town's 1982–85 HAP is a goal for 75 new or rehabilitated housing units for families to be provided under the Public Housing or section 8 programs.

Huntington Housing Authority figures for Gateway Gardens, located at the southwest corner of New York and Lowndes Avenues, showed that as of January 10, 1984, of the 30 family units in the project, 26 were occupied by black families and four by Hispanic families. With respect to the ten units for elderly persons, eight were occupied by blacks and two by whites.

Prior to January 10, 1984, the waiting list for Gateway Gardens was closed. It was reopened for one-bedroom units briefly in the spring of 1984, and then closed again. As of January 10, 1984, according to Housing Authority figures, there were 111 names on the waiting list, divided as follows:

| Unit Type | Whites | Blacks | Hispanics |
|---|---|---|---|
| Senior citizen | 17 | 10 | 5 |
| Family 2 bedroom | 6 | 19 | 12 |
| Family 3 bedroom | 5 | 19 | 12 |
| Family 4 bedroom | 1 | 4 | 1 |
| Totals | 29 | 52 | 30 |
| Totals (families only) | 12 | 42 | 25 |

Lincoln Manor was occupied in July 1980. The project is privately owned and managed by the Huntington Housing Authority, which is responsible for rentals. The project is located at the southwest corner of Ninth Street and First Avenue.

Housing Authority figures for Lincoln Manor as of January 10, 1984 showed that eight of the 30 units were occupied by

handicapped persons. The remaining 22 units were occupied by families. The elderly and handicapped are eligible to occupy family units, but families are not eligible to occupy elderly or handicapped units. Overall, 21 of the units were occupied by white persons, six by blacks, and three by Hispanics.

Housing Authority figures as of January 10, 1984 showed that a total of 102 persons were on the waiting list for units at Lincoln Manor. The waiting list was closed on that date. The list divided as follows:

| Unit Type | Whites | Blacks | Hispanics |
|---|---|---|---|
| 1 bedroom | 34 | 14 | 5 |
| 2 bedroom | 21 | 9 | 2 |
| 3 bedroom | 1 | 10 | 6 |
| Totals | 56 | 33 | 13 |

Paumanack Village is located on the south side of Pulaski Road, east of Naples Lane.

Housing Authority figures as of January 1984 showed that 22 rehabilitated units were rented to lower income families in Huntington. On the same date, the Housing Authority had reported racial statistics on the occupancy of 21 units. These statistics showed that nine of the units were occupied by black families, nine by Hispanic families, and three by white families.

The Housing Authority participates in the HUD existing section 8 program. Under this program, qualifying persons may obtain an existing section 8 certificate from the Housing Authority. With the certificate, the person or family must locate a rental housing unit in Huntington. Rent for the unit must not exceed limits prescribed by HUD. HUD will then subsidize the rental on the unit so that the person or family pays no more than 30% of income for housing costs.

In January 1984, the Housing Authority had available to it 235 existing section 8 certificates. Housing Authority figures for the existing section 8 program as of January 10, 1984 showed that 219 units in Huntington were occupied by persons or families holding existing section 8 certificates. Of this number, 162 holders of certificates were families, and 59 were elderly or handicapped. Of the family certificate holders, 52 families were white, 88 were black, and 22 were Hispanic. Of the elderly and Hispanic, 47 were white, nine were black, and one was Hispanic.

The Housing Authority's waiting list for existing section 8 certificates in January 1984 divided as follows:

| Housing Type | Whites | Blacks | Hispanics |
|---|---|---|---|
| 1 bedroom | 58 | 24 | 7 |
| 2 bedroom | 40 | 68 | 24 |
| 3 bedroom | 26 | 34 | 19 |
| 4 bedroom | 0 | 21 | 3 |
| Totals | 124 | 147 | 53 |
| Percentage | 39 | 45 | 16 |

Sometime in 1978, the Huntington Community Development Agency, then under the directorship of Michael Miness, proposed to Town officials that an abandoned elementary school (Lincoln School) located at 9th Street and 1st Avenue be converted with new HUD section 8 substantial rehabilitation funds into lower cost housing. The Lincoln School had been used by the Huntington School District until 1971. For a period during the 1970s, the building had been purchased and occupied by the Association for the Help of Retarded Children. That organization was the fee title owner of the property at the time of the rezoning. In 1978, the building was vacant and deteriorating. The Community Development Agency's proposal called for the development of this project by a private developer.

In order to proceed with this section 8 substantial rehabilitation program at the Lincoln School site, it was necessary that the developer of the project obtain multifamily residential zoning for the property. At the time, the site was zoned in the R-5 zoning classification, which permits two-family dwellings as well as single-family dwellings.

The Community Development Agency's proposal with respect to the Lincoln School site envisioned a development maintained and operated—but not owned—by the Housing Authority.

On August 22, 1978, Ronald Glickman, then the Town Attorney, wrote a letter to Miness responding to a "recent inquiry" concerning rezoning of the Lincoln School site to the R-3M garden apartment special

district zoning category. Glickman stated that in his opinion if the Town Board were to grant a zone change to R–3M for the Lincoln School site, such zone revision would meet the qualifications and requirements of R–3M zoning. Glickman stated: "[T]he fact that the R–3M zoning category makes reference to an 'urban renewal plan' should not present difficulties herein since the Community Development program has superseded the older urban renewal designations. Thus, so long as the subject premises is within the community development area, it meets the requirements of Section 62–4.8 of the Town Code."

On June 26, 1979, the Town Board adopted a resolution amending the Town zoning map to provide for an R–3M zoning classification for the Lincoln School site. Enactment of this change was conditioned upon there being a maximum of 30 housing units on the parcel. The zone change had been requested by Daniel Regan Associates, the organization/builder selected to develop the project. The Lincoln Manor management plan prepared by Daniel Regan Associates set forth certain priorities and occupancy goals with respect to decisions on tenant selection. One of the priority and occupancy goals provided in the plan reads, "Racial and ethnic diversity generally to reflect the composition of the community, which is 95% white and 5% black and hispanic." The Huntington Housing Authority was retained by Daniel Regan Associates to manage the Lincoln Manor project.

Pursuant to HUD regulations, a local community may use what is known as a "pre-approved site" procedure to receive priority consideration for a particular site for section 8 new construction funding. Under the procedure, the community may submit a proposed housing site to HUD for evaluation before developing a specific proposal for the housing to be built on that site. If HUD grants pre-approval for the application, it may reserve the funds for that site in the amount of the subsidy necessary to support the proposed number of units to be built on the site. This procedure ensures that funding for the ultimate proposal for housing will be available.

Projects and sites granted pre-approval under this special procedure are not required to compete for available section 8 funding in the normal course of grant requests pursuant to HUD NOFAs.

On April 18, 1980, Harold T. Letson, Huntington's Director of Planning, wrote a memorandum to Charles Offerman, Acting Director of the Huntington Community Development Agency, discussing the "probable impacts" of development of the New York Avenue site with low rent section 8 housing units. The memorandum considered the possible impact on the Huntington School District No. 3 with respect to increased minority enrollment resulting from construction of the project. According to Letson, "[m]inority group attendance would increase from 381 children to 413 children, and the ratio would increase from 17.6% of enrollment to 18.1% of enrollment." Letson concluded that there were positive advantages attending construction of the proposed project for both the majority and minority groups that "would tend to outweight [sic] the aspect of expanded minority group concentration in the school district, which, in any event, appears miniscule [sic]."

Pursuant to a letter from Alan Weiner to Kenneth Butterfield, dated July 10, 1980, HUD granted pre-approval for the proposed section 8 development in the Urban Renewal Area for 150 units of family housing and set aside $1,012,140 in section 8 subsidies for that purpose. Approval was granted subject to the Town, *inter alia*, amending its HAP to provide a goal for new construction. *See supra* p. 766.

In a memorandum dated July 21, 1980, Butterfield advised all councilmen of the HUD pre-approval for the Huntington Station project and scheduled a meeting of the Town Board for July 24, the meeting to be attended by Town legal counsel. Butterfield ended his memorandum with the statement: "Once again, I feel it's incumbent to caution you about disclosing the contents of this memo and the attachment [HUD's pre-approval letter] until we have obtained the counsel's recommendations."

In a memorandum dated October 23, 1980, Butterfield advised all councilmen about developments with respect to the Huntington Station project. He stated in part:

HUD has set a deadline of December 1st to hear from the developer about the proposal. I do not know what their deadline would be concerning their posture on future federal funding of our Community Development Agency, but I assume it is closely connected.

Accordingly, I would like to hear from you either in the affirmative or in the negative as to whether the east side of urban renewal be developed [sic] with section 8 funding. Please keep in mind the caveat in my memo of July 21st. We cannot bury our heads in the sand as to future funding for community development projects, nor can we ignore the vulnerability of our housing plan which may be subjected to litigation if we are not earnestly attempting to alleviate some of the housing needs in our Town. We can expect resistance to any project we propose, but the force and effectiveness of that opposition can only be defused by a predetermined attitude on the part of the Board to proceed with the project. In other words, if we are all in favor of it, the opposition will lose steam.

In a letter dated December 11, 1980, Weiner advised Butterfield that the pre-approval letter of July 7, 1980 for the Huntington Station site required Huntington to establish a schedule leading to the submission of a preliminary proposal by a qualified developer. Weiner advised that no response to that request for a schedule had been received and that HUD could not hold funding commitments available for projects where there has been no evidence of acceptable progress. Weiner also requested that a schedule for undertaking various required actions be submitted to HUD by January 15, 1981.

In a memorandum from Butterfield to the other councilmen dated December 11, 1980, Butterfield reviewed the status of the Huntington Station project. He stated in part:

I must, therefore, reiterate that I support the development of the northeast corner of Broadway and Route 110 by utilizing Section 8 funding of thirty units for senior citizens and 120 units for families. Housing Help's proposal to HUD is pending and one of the major considerations that HUD will be faced with is, are we moving ahead with housing? If the answer is, yes, then Housing Help's ill-conceived proposal will not be seriously considered and the continuation of our community development funds will be secured. If the answer is, no, then the courts will be the arena where planning and zoning is [sic] determined. That would be irresponsible on the part of the Board.

\*   \*   \*   \*   \*   \*

I further implore you to respond to me immediately in writing so that we can contact HUD in an effort to maintain the allocation of funding which could easily be diverted to another community. I don't know how many memos I need to write, but I refer you to my memos of October 23rd and October 29th. Let's get on with it!

On January 13, 1981, the Huntington Town Board passed two resolutions relating to the Huntington Station project. The purpose of these resolutions was to confirm the Town's commitment to the project and to request that HUD maintain its pre-approval of the site. One of the resolutions states that the Town Board "emphatically supports the development of these parcels with Section 8 Assisted Housing for moderate or middle income families." Both resolutions referred to the project as proposed for 150 units, of which 120 were to be for families and 30 for the elderly. Both resolutions were adopted by a 4 to 1 vote.

In February 1981, the Town selected Related Housing Companies to be developer for the Huntington Station project.

By a letter dated February 17, 1981, Butterfield replied to Weiner's letter of January 27, 1981, which commented on the January 13 resolutions. Butterfield, in explaining the Town revision of the unit type

projection from 150 family units to 120 family units and 30 elderly units, stated the Town had from the outset intended that the one bedroom units in the project would be for the elderly. Butterfield also stated that the three-year HAP goal would be amended and, "unless directed otherwise, will include the 150 units of new construction, specifically identifying 30 units for Senior Citizens."

On February 23, 1981, plaintiffs filed this action, challenging, among other things, HUD's pre-approval of the Huntington Station site.

In 1980, blacks comprised 3.35% of the Town's population.

The Town's first zoning ordinance was adopted on June 26, 1931. On December 5, 1934, the Town Board adopted a completely redrafted ordinance that was amended from time to time until a new zoning code was adopted by the Town Board on June 3, 1969. In 1956, multiple residential dwellings were eliminated as permitted uses in all but the general and special business districts and in those districts where two-family dwellings were permitted. On November 22, 1960, two-family dwellings were deleted from the Code but two-family dwellings were still permitted in Residence E and Special Business Districts (today known as R-5 and C-3 Districts, respectively). On March 4, 1964, the Town Board created a public housing district that, in addition to its other provisions relating to multiple dwellings, permitted two-family dwellings. The land upon which Gateway Gardens is situated was placed in the new zone. On June 3, 1969, the R-3M Residence District was created. In addition to its other provisions relating to multiple family dwellings, it permitted two-family dwellings. Also on June 3, 1969, the C-1 Office Residence District was added, and also permitted two-family dwellings.

The R-3M district was adopted on June 3, 1969 and provided for multiple dwelling use in urban renewal areas, or for projects to be owned and managed by the Huntington Housing Authority, inside or outside of an urban renewal area. The Public Housing District was merged with, and became a part of, the R-3M residence district in 1969. Only three developments—Gateway Gardens, Whitman Village, and Lincoln Manor—have been built in Huntington pursuant to R-3M zoning.

There is only one vacant parcel of land in Huntington currently zoned R-3M. The parcel at the northeast corner of Broadway and New York Avenue is partially zoned C-6 and partially zoned R-3M. This is the same parcel upon which the Town requested pre-approval for its section 8 housing development for a 150-unit project, pursuant to a letter from Butterfield to HUD on June 2, 1980. The R-3M section of this parcel contains approximately six acres.

The R-RM Retirement Community District set forth in the Town Zoning Code permits multiple residential developments for aged persons. Only one development—Paumanack Village—has been built in Huntington pursuant to R-RM zoning. Other than the parcel involved with Paumanack Village, there is no vacant R-RM-zoned land in Huntington.

Under section 281 of the New York Town Law, a developer may be given approval to cluster units into a multi-family context with the total number of units not to exceed that number of units that could be built under the existing zoning provisions. These section 281 developments all involve parcels where the underlying zoning provides for single-family or two-family detached housing.

## II. Legal Framework

The central issue in this case is whether defendants violated title VIII and the New York Town Law by restricting private construction of multi-family housing units to an urban renewal area and by refusing to provide multi-family zoning for the Matinecock Court project proposed by HHI for a 14.6-acre site at the corner of Elwood and Pulaski Avenues. The parties disagree over the standard of proof on the title VIII claim.

According to plaintiffs, although the Supreme Court has required proof of discriminatory *intent* on equal protection claims, *see Village of Arlington Heights v. Metro-*

politan Housing Development Corp., 429 U.S. 252, 264–65, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976); *accord, e.g., Coalition of Bedford-Stuyvesant Block Association, Inc. v. Cuomo*, 651 F.Supp. 1202, 1209 (E.D.N.Y.1987), the weight of authority holds that proof of a discriminatory *effect* alone would establish a *prima facie* case under title VIII. For their part, defendants argue that the Second Circuit's decision in *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir.1979), implicitly adopted the disparate treatment analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), where the Court held that a prima facie case of racial discrimination would be made out in a title VII action if the plaintiff could show

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. [Footnote omitted.]

In the *McDonnell Douglas* formula, "if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824). Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825).

At the second stage of the *McDonnell Douglas* process, when the defendant must articulate a legitimate, nondiscriminatory reason for its conduct, the defendant merely has a burden of production, not the burden of persuasion. *Id.* at 254–55, 101 S.Ct. at 1094. The ultimate burden of persuasion is with the plaintiff at all times. *Id.* at 253, 256, 101 S.Ct. at 1093, 1095.

Against this background, the court turns to *Robinson v. 12 Lofts Realty, Inc., supra.* Robinson sued the owner of a cooperative apartment building and one of its shareholders, under title VIII and 42 U.S.C. §§ 1981 and 1982, after the shareholders rejected him as a prospective purchaser. Discussing the standard for a *prima facie* case under title VIII, the court observed:

> The courts that have dealt with this question have concluded that in order to prove a prima facie case of race discrimination plaintiffs needed to show only that the action complained of had a racially discriminatory effect; they were not required to show that the defendants acted with racially discriminatory motivation.

610 F.2d at 1036. The first case cited by the Second Circuit for this proposition was *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir.1977) (*Arlington Heights II*), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). In *Arlington Heights II*, the Seventh Circuit had before it a question left open by the Supreme Court's decision that an equal protection claimant must prove discriminatory motive: what is the standard of proof for a title VIII claim? "[T]he Seventh Circuit, along with most other circuits, has held that discriminatory impact is the appropriate standard by which to determine whether a plaintiff has made out a prima facie case under § 3604(a)." *Robinson*, 610 F.2d at 1037 (footnote omitted). (The statute mentioned, 42 U.S.C. § 3604(a), prohibits refusals to sell or rent a dwelling on the basis of race, color, religion, sex, or national origin.)

Analogizing to *McDonnell Douglas*, *Robinson* held that

> a plaintiff who claims that he as an individual has been the victim of a discriminatory denial of housing[ ] may establish his prima facie case by proving the following facts:

(1) that he is Black;

(2) that he applied for and was qualified to rent or purchase the housing;

(3) that he was rejected; and

(4) that the housing opportunity remained available.

*Id.* at 1038 (citing *McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824).

Consistent with its application of the *McDonnell Douglas* formula, the Second Circuit added that, once the plaintiff makes out a *prima facie* case, the defendant must come forward with evidence to show its actions were not racially motivated, *id.* at 1039; thereafter, plaintiff would have an opportunity to show that defendant's stated reason was pretextual, *id.* at 1040 n. 13. The court concluded with an admonition that discriminatory intent is often hidden, so "when a discriminatory effect is present, the courts must be alert to recognize means that are subtle and explanations that are synthetic." *Id.* at 1043.

On the surface, then, it would appear that the familiar standards of a title VII case would apply to this title VIII action. If so, assuming plaintiffs could make out a *prima facie* case, defendants would be required to do no more than articulate a legitimate, nondiscriminatory justification for their actions, and plaintiffs would be required to show that the justification was a pretext. As stated in *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093, plaintiffs would have the ultimate burden of persuasion at all times.

Plaintiffs do not believe that this is the law. They point to the following language from a recent opinion of the Fourth Circuit:

The burden confronting defendants faced with a *prima facie* showing of discriminatory impact is different and more difficult than what they face when confronted with a showing of discriminatory intent. Defendants may overcome a *prima facie* showing of discriminatory intent by articulating some "legitimate non-discriminatory reason for the challenged practice." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). However, when confronted with a show-

ing of discriminatory impact, defendants must prove a business necessity sufficiently compelling to justify the challenged practice. *Williams v. Colorado Springs School District # 11,* 641 F.2d 835, 842 (10 Cir.1981); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

*Betsey v. Turtle Creek Associates,* 736 F.2d 983, 988 (4th Cir.1984) (footnote omitted); *accord Davis v. Richmond, Fredericksburg & Potomac Railroad,* 803 F.2d 1322, 1328 (4th Cir.1986) (defendant's burden in disparate impact case is heavy; once discriminatory impact is shown, defendants must prove compelling necessity to justify it).

What is more, to the extent that the Second Circuit has sent out conflicting signals for title VIII cases, plaintiffs seek harmony in a footnote in *Robinson.* Specifically, a divided panel of the Second Circuit had held that there was no violation of title VIII where a private landlord had imposed minimum income standards for prospective renters. *Boyd v. Lefrak Organization,* 509 F.2d 1110 (2d Cir.), *cert. denied,* 423 U.S. 896, 96 S.Ct. 197, 46 L.Ed.2d 129 (1975). The salient portion of *Boyd* was the court's discussion of the racial impact of the landlord's rule:

While blacks and Puerto Ricans do not have the same access to Lefrak apartments as do whites, the reason for this inequality is not racial discrimination but rather the disparity in economic level among these groups. While a showing of a disproportionate effect on nonwhites is sufficient to require application of the compelling state interest standard in the context of an equal protection challenge to government action, such an analysis is inappropriate in the context of a purely private action asserting a claim of racial discrimination. A businessman's differential treatment of different economic groups is not necessarily racial discrimination and is not made so because minorities are statistically overrepresented in the poorer economic groups. The fact that differentiation in eligibility rates for defendants' apart-

ments is correlated with race proves merely that minorities tend to be poorer than is the general population. In order to utilize this correlation to establish a violation of the Fair Housing Act on the part of a private landlord, plaintiffs would have to show that there existed some demonstrable prejudicial treatment of minorities over and above that which is the inevitable result of disparity in income. Just as this court will not impose even on the government an affirmative duty to construct low-income housing when the decision not to build is not racially motivated, so we will not impose an affirmative duty on the private landlord to accept low income tenants absent evidence that his motivation is racial rather than economic in origin.

*Id.* at 1113 (citations omitted).

The *Robinson* panel observed that the Seventh Circuit, in *Arlington II, supra,* and most other circuits agreed "that discriminatory impact is the appropriate standard by which to determine whether a plaintiff has made out a prima facie case under § 3604(a)." *Robinson, supra,* 610 F.2d at 1037. A footnote on the quoted language maintained that *Boyd* was not inconsistent with this rule. After comparing the views of the *Boyd* majority and dissent, the footnote stated:

> [T]hese conclusions were drawn after a full trial of the case, in which the defendant had come forward with evidence as to why the criterion it adopted was used and why it was relevant to its decisions whether to rent the premises. The conclusion after a full trial that the plaintiffs have failed to show racial motivation does not imply that proof of motivation was required in order for the plaintiffs to establish a prima facie case.

*Id.* at 1038 n. 10.

Whether or not the *Robinson* footnote provides an intellectually satisfying explanation of *Boyd,* the footnote is, at this writing, the Second Circuit's last word on the subject. As such, it binds this court. Moreover, *Boyd* is distinguishable from this case, arguably, because it involved a private landlord's rental decisions, while this case involves a municipality's zoning practices. On the other hand, *Robinson's* adoption of an "effects test," *id.* at 1036–38, might be dictum, because the case involved discrimination against an individual, rather than, as here, a class. *Angell v. Town of Manchester,* E.O.H. (P–H) ¶ 15,-398, 15,998.245, 15,998.273 (D.Conn. Oct. 14, 1981). *Angell,* nevertheless, followed *Robinson's* suggestion and held "that a prima facie violation of Title VIII may be established by proof that the defendants' acts had a racially discriminatory effect, that is, that the acts have a greater adverse impact on one racial group than another or that the acts have a segregative effect on the community." *Id.* at 15,998.-274. Evidently dubious about *Robinson's* attempt to harmonize *Boyd, Angell* avoided reliance on the older case by noting that it had been decided before *Arlington II* (and, of course, before *Robinson* had endorsed *Arlington II*) and that it had assumed the applicability of an intent standard without explaining why. *Id.* n. 75.

Further complicating matters is a limitation within *McDonnell Douglas:* "The critical issue before us concerns the order and allocation of proof in a private, non-class action challenging employment discrimination." 411 U.S. at 800. "In a class action, on the other hand, proof that each individual class member is a victim of discrimination is not a necessary component of a *prima facie* case of a pattern and practice of discrimination." *Thompson v. Sawyer,* 678 F.2d 257, 284 (D.C.Cir.1982).

While the Second Circuit has equivocated on the appropriate standard of proof in a title VIII case, the other circuits have not been quite unanimous, either. Two useful *vade mecums* are *Brown v. Artery Organization, Inc.,* 654 F.Supp. 1106 (D.D.C. 1987) (Greene, J.), and *Keith v. Volpe,* 618 F.Supp. 1132 (C.D.Cal.1985) (Pregerson, Cir. J., sitting by designation). *Brown* took note that

> [s]ome of the decisions hold, or at least intimate, that evidence of discriminatory effect is alone sufficient to establish a *prima facie* case under the [Fair Housing] Act. Other decisions—sometimes

the same decisions—suggest that effect by itself is never enough; that there must also be a showing that the private landowner intended to discriminate. *See generally Betsey, supra; Arlington II, supra.*

*Brown, supra,* 654 F.Supp. at 1114.

The court added that the cases had distinguished between "adverse impact discrimination," i.e., a practice that hurts minorities within the group to which the practice is applied, and "ultimate effect discrimination," i.e., a practice that hurts the entire population of a community. *Id.* at 1115. Continuing his analysis, Judge Greene stated:

> Moreover, in some of the cases involving allegations of ultimate effect discrimination, liability under the Fair Housing Act appears to depend upon whether the defendant is a governmental body or a private entity, suggesting that proof of discriminatory effect alone (without proof of discriminatory intent) is enough only when the defendant is a governmental body. Indeed, the "ultimate effect" decisions generally involve governmental defendants, *see, e.g., [Resident Advisory Board v.] Rizzo,* 564 F.2d [126,] ... 149 [ (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978) ]; *[United States v. City of] Black Jack, [Missouri,]* 508 F.2d [1179,] ... 1184–85 [ (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975) ], and some of them explicitly hold that an action against a private landlord cannot be premised upon allegations of ultimate effect discrimination. *See, e.g., Boyd v. Lefrak Organization,* 509 F.2d 1110 (2d Cir.1975); *Dreher v. Rana Management, Inc.,* 493 F.Supp. 930 (E.D. N.Y.1980).

*Id.*

Judge Greene was writing on a *tabula rasa* in the District of Columbia Circuit. He formulated a series of rules, the first of which is relevant to the case at bar.

> If the defendant is a governmental body, proof of discriminatory impact of its actions on the community for which it serves suffices to establish a *prima fa-*

*cie* case of violation of the Fair Housing Act. It is unclear from the decided cases whether the governmental body involved can overcome that *prima facie* case by proof of a neutral or positive purpose or whether, in view of the objectives of the Fair Housing Act, the perpetuation of racial segregation or other discrimination by government must be regarded as so pernicious that evidence of a benign intent will not save the activity. Since, in the present posture at least, this case does not present that issue, its resolution may properly be left to another day or another court.

*Id.* (footnote omitted).

In *Keith v. Volpe, supra,* Judge Pregerson described the areas of agreement and disagreement among the circuits.

> The circuits that have addressed the issue have agreed that the phrase "because of race" [in 42 U.S.C. § 3604(a) ] does not require proof of discriminatory intent; rather, proof of discriminatory effect may be sufficient to demonstrate a violation of the Fair Housing Act.

> Once the plaintiff has established a prima facie case by demonstrating racially discriminatory effect, the burden shifts to the defendant to demonstrate that non-discriminatory reasons justify its conduct. If the defendant offers no valid non-discriminatory reasons for its actions, then the plaintiff has succeeded in proving a Title VIII violation. If the defendant does offer valid non-discriminatory reasons, the court must determine whether they are substantial enough to justify the racially discriminatory effect.

> The circuits have applied different standards, however, in determining how important a discriminatory effect is to proving a prima facie case and in determining whether the defendant's proffered justifications are sufficient to rebut the plaintiff's prima facie case....

> The Third and Eighth Circuits seem to take the position that proof of discriminatory effect alone is always sufficient to establish a prima facie Title VIII violation. *Rizzo,* 564 F.2d at 148; *Black Jack,* 508 F.2d at 1184–85. In contrast,

the Seventh Circuit has held that proof of discriminatory effect without a showing of discriminatory intent establishes a Title VIII violation only under some circumstances. *Arlington Heights*, 558 F.2d at 1290.

618 F.Supp. at 1147–48 (citations omitted).

*Keith* cited *Rizzo, Black Jack*, and *Arlington Heights II* as indicative of the split among the circuits on the title VIII standard of proof. These are probably the three most frequently cited cases on the subject. The court shall review the discussions in each of the three cases.

In *United States v. City of Black Jack, Missouri*, 508 F.2d 1179 (8th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), plaintiffs contended that the defendant city had denied persons housing because of race, 42 U.S.C. § 3604(a), and had interfered with the right to equal housing opportunity, *id.* § 3617, 508 F.2d at 1181. The city's conduct giving rise to the action was adoption of a zoning ordinance prohibiting construction of new multiple-family dwellings. *Id.* The city adopted the zoning ordinance after the Inter Religious Center for Urban Affairs obtained an option on a parcel of land for the purpose of building two-story townhouses for persons of low and moderate income. *Id.* at 1182–83. The city had a black population of between 1% and 2%, while the nearby city of St. Louis was 40.9% black. *Id.* at 1183.

The Eighth Circuit held:

To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect. The plaintiff need make no showing whatsoever that the action resulting in racial discrimination in housing was racially motivated. Effect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations, but more importantly, because

* * * [w]hatever our law was once, * * we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.

*Id.* at 1184–85 (citations and footnotes omitted).

Not only did *Black Jack* hold that proof of effect was enough; the court further held that, once a prima facie case is established, the governmental defendant must "demonstrate that its conduct was *necessary to promote a compelling governmental interest*," *id.* at 1185 (emphasis added).

In light of this standard, the court of appeals reversed the district court's judgment in favor of the city, noting that the lower court had failed to take into account the zoning ordinance's "ultimate effect" of keeping 85% of blacks in the metropolitan area from living in Black Jack, at a time when 40% of them were in substandard or overcrowded housing. *Id.* at 1186. The Eighth Circuit also discussed the "historical context" of the zoning ordinance and of the process confining blacks to the inner city while whites lived in surrounding areas. *Id.*

The court rejected the city's proffered justifications—road and traffic control, prevention of school overcrowding, and prevention of devaluation of adjacent homes—because it found that the zoning ordinance did not further the asserted governmental interests. *Id.* at 1186–87. Accordingly, *Black Jack* did not decide whether the interest behind the ordinance was constitutionally permissible and important enough to outweigh the private detriment it caused, nor whether less drastic means were available to reach the stated objective. *Id.* at 1187. It was not necessary to decide whether these elements of the compelling state interest test had been met in view of the court's rejection of the asserted nexus between the ordinance and governmental interests. *Id.*

*Arlington Heights II* concerned the refusal by the Village of Arlington Heights, Illinois to rezone plaintiffs' property and thus permit construction thereon of federally financed low-cost housing. *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283,

1285 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). The Seventh Circuit repeated its earlier holding, stated before the case had been remanded by the Supreme Court, that the refusal to rezone had had a discriminatory effect. *Id.* at 1288. The "basic question," the court stated, was "whether the Village's action violated sections 3604(a) or 3617 because it had discriminatory effects when that action was taken without discriminatory intent." *Id.* There were

> two preliminary subissues: first, whether a finding that an action has a discriminatory effect, without a concomitant finding that the action was taken with discriminatory intent, is ever enough to support the conclusion that the action violated section 3604(a); and, if so, under what factual circumstances will it be enough?

*Id.*

The court cited a series of cases showing that the Fair Housing Act must be interpreted broadly, *id.* at 1289, and concluded that "[c]onduct that has the necessary and foreseeable consequence of perpetuating segregation" violates section 3604(a), 558 F.2d at 1289. It was important to the court's thinking that intent is often difficult to prove, especially because it was no longer fashionable to be overtly bigoted. *Id.* at 1290. Therefore, the Seventh Circuit held that discriminatory effect *can* provide the basis for a title VIII violation, but declined to create a per se rule. *Id.* Instead, the court listed four factors that ought to be considered:

> (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis* [, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individu-

al property owners who wish to provide such housing.

*Id.*

*Arlington Heights II* holds that a defendant cannot escape title VIII liability just because whites as well as minorities are affected adversely by the conduct over which suit was brought. *Id.* at 1291. The court noted that *Black Jack, supra,* and *Kennedy Park Homes Association v. City of Lackawanna,* 436 F.2d 108 (2d Cir.1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971), both found a discriminatory effect in zoning ordinances that prevented construction of low-income housing, even though whites as well as minorities would be deprived of housing. 558 F.2d at 1291. The reason was that the impact remained discriminatory when it perpetuated segregation. *Id.; see Brown, supra,* 654 F.Supp. at 1115.

The Seventh Circuit concluded that the second factor it listed—some evidence of discriminatory intent—was the least important of the four; it would help plaintiffs to show some discriminatory intent, but the hypothesis behind the four-factor analysis is that proof of intent has been too weak to justify relief on that ground alone. 558 F.2d at 1292. Also, the court urged caution in reviewing evidence of intent, because "[t]he bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis," *id.*

On the third factor—the defendant's interest—*Arlington Heights II* said:

> [I]f the defendant is a governmental body acting outside the scope of its authority or abusing its power, it is not entitled to the deference which courts must pay to legitimate governmental action. On the other hand, if the defendant is a governmental body acting within the ambit of legitimately derived authority, we will less readily find that its action violates the Fair Housing Act.
>
> \* \* \* \* \* \*
>
> [M]unicipalities are traditionally afforded wide discretion in zoning. *Village of*

*Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974).

558 F.2d at 1293.

On the fourth factor, the court stated that it would be more willing to grant relief when the plaintiff seeks the removal of obstacles to the building of integrated housing than when the plaintiff asks the court to compel the government to take affirmative steps such as appropriating money to build integrated housing. *Id.*

The third case in the trilogy from the courts of appeals is *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978). The court found that the class action plaintiffs had established a prima facie case under section 3604(a) "by proving that the [City of Philadelphia] agencies' acts had a discriminatory effect and that the agencies have failed to justify the discriminatory results of their actions." *Id.* at 146. After observing that the Supreme Court had required proof of intent for equal protection claims, *Rizzo* "conclude[d] that, in Title VIII cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response." *Id.* The court held that section 3604(a)'s use of the term "because of race" did not mean plaintiffs had to prove discriminatory intent. *Id.* at 146–48.

The Third Circuit understood *Arlington Heights II* as reaching a similar result. According to *Rizzo*, the four factors listed by the Seventh Circuit were merely the "standard upon which ultimate Title VIII relief may be predicated, rather than indicating the point at which the evidentiary burden of justifying a discriminatory effect will shift to the defendant." 564 F.2d at 148 n. 32. Judge Pregerson, for one, believes, to the contrary, that the Seventh Circuit's four factors place a wedge between *Arlington Heights II* and the *Rizzo/Black Jack* line of cases. *Keith, supra*, 618 F.Supp. at 1148.

*Rizzo* explicitly disagreed with *Black Jack* in one particular: whereas *Black Jack* had required defendants against whom a *prima facie* case had been established to justify their actions by showing a "compelling" interest, the Third Circuit thought this too onerous. *Rizzo*, 564 F.2d at 148. The court set the following "rough measures" for a defendant seeking to rebut a *prima facie* case:

> a justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact.

*Id.* at 149 (footnote omitted).

Other courts have introduced their own wrinkles. The Sixth Circuit, agreeing with *Arlington Heights II* that the second of that case's four factors was the least important, decided not to consider evidence of discriminatory intent at all. *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 575 (6th Cir.1986). The Fifth Circuit holds that a title VIII plaintiff need not show discriminatory intent, so long as he can show "a *significant* discriminatory effect." *Hanson v. Veterans Administration*, 800 F.2d 1381, 1386 (5th Cir.1986).

▉ The foregoing review of the case law demonstrates that title VIII jurisprudence remains in flux and that the definitive word has yet to be spoken by the Second Circuit, let alone the Supreme Court. Certain principles, however, do emerge from the cases. It is not necessary for plaintiffs to prove discriminatory intent before they may succeed on a claim under section 3604(a). Although it is not necessary for each plaintiff to prove himself the victim of discrimination, because this is a class action, the three-step analysis of *McDonnell Douglas* remains appropriate; in other words, if plaintiffs prove a *prima facie* case, defendants must rebut it, and if defendants articulate a legitimate, nondiscriminatory reason for their conduct, plaintiffs must show that the reason is a pretext. Finally, *Robinson* cited *Arlington Heights II* often and approvingly. While much of *Arlington Heights II* did not apply specifically to *Robinson*, because the former was a zoning case and the latter dealt with approval to purchase a cooperative

apartment, this is a zoning case. And this court believes that *Arlington Heights II* provides the best framework for analysis of title VIII challenges to zoning ordinances.

By listing four factors for analyzing discriminatory effect, *Arlington Heights II* provides for more flexibility and realism than would a per se rule that discriminatory effect is equivalent to a *prima facie* case. Also, the court finds *Black Jack's* requirement that a defendant rebutting a *prima facie* case need show a compelling interest too harsh. In equal protection analysis, at least, it is almost impossible to show a compelling state interest. *See* Gunther, *The Supreme Court, 1971 Term— Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 8 (1972); *see generally* L. Tribe, American Constitutional Law § 16–6 (1978). And, in a title VIII case, a requirement that a zoning ordinance be defended by a showing of a compelling interest would lead to anomalous results, because it is hard to imagine any zoning ordinance that *has* to be the way it is. Because the *Arlington Heights II* test leaves breathing room for the countless fact patterns that courts may encounter in title VIII zoning cases, this court chooses to follow the approach of the Seventh Circuit, which, it appears, is not foreclosed by any precedent of the Second Circuit.

### III. *Disputed Facts*

As seen in Part I, the parties agree on many of the "objective" facts in the case: statistics, texts of documents, dates on which events took place. Generally, the disagreements are over more subjective matters, such as intentions, shades of meaning, and recollections of conversations.

The court finds that the following facts have been established by the preponderance of credible evidence in the case. HHI is unable to proceed with the Matinecock Court project, which is designed to be a 162–unit housing project for lower-income families, unless the parcel of land in question is zoned for multi-family use. HHI is

a Huntington-based, non-profit housing civil rights organization. HHI was founded in 1967 and has a multi-racial board. Ulysses Spicer, its president, is black.

The Huntington Branch NAACP, a branch of the national office of the NAACP, has approximately 200 members, most of whom are black. It seeks to eliminate housing discrimination and promote integration.

HHI decided, in about 1978, to build a subsidized, lower-income housing project for Huntington. It hoped to obtain "section 8" funds from the Department of Housing and Urban Development (HUD). HHI asked Suffolk Community Development Corp. (SCDC) to look for suitable sites. SCDC identified eighteen potential sites in Huntington.

On various occasions, HHI's executive director, Marianne Garvin, consulted with Michael Miness, the director of Huntington's Community Development Agency, about HHI's plans to build section 8 housing in the town. The Matinecock Court project could not be built without multi-family zoning, since the project requires densities of ten to twelve units per acre.

In 1979, HHI retained Alan Mallach, a housing specialist, to help in the search of an appropriate site for HHI's section 8 project. HHI set various criteria: the project had to be located outside the "racially impacted" areas of town, in order to foster integration; it had to be accessible to major roadways and public transportation; it had to be reasonably accessible to schools and community facilities; it had to be readily developable and affordable; it could not have a significant impact on the immediate neighborhoods or adjacent land uses; and it had to be available with a lengthy option, to permit HHI to put together the elements of the project.

The only vacant site zoned under the R–3M classification for multi-family housing was in the Town's Urban Renewal area, where HHI did not wish to build, because that area already had a substantial minority population. In other words, HHI believed that building on this site—the MIA parcel—would not serve the purposes of

integration. Thus, HHI conducted its search for a site without being guided by the contemporary state of the Town's zoning map.

In late 1980 and early 1981, HHI's attention focussed on the 14.8–acre vacant site at the intersection of Elwood and Pulaski. Mallach evaluated the site favorably, though it was zoned under the R–40 classification, which provides for single-family homes on lots of at least one acre. On January 23, 1980, HHI obtained an option on the Elwood-Pulaski site. The option provided for annual payments of $5,000, with purchase dependent upon HHI obtaining multi-family zoning.

The parties dispute whether Miness initially concurred orally in the suitability of the site for HHI's project; after Garvin met Miness, she sent him a letter stating that he had, and his responding letter said that he had not. Plaintiffs argue that Garvin testified at trial and Miness did not, so Garvin should be believed. But the court need not resolve this dispute in order to decide the case.

Representatives of HHI met with members of the Town Board on February 22, 1980. HHI asked that the meeting be confidential, and all four members of the Board who were present gave such assurance. When HHI's representatives asked for a zoning change for the Elwood-Pulaski site, the Board members refused to discuss the substance of the request, because New York State's Open Meetings Law, N.Y.Pub. Off.Law §§ 100–111 (McKinney supp. 1987), barred their doing so. Specifically, section 103 provides for open meetings of public bodies, section 104 requires public notice of meetings, and section 107(1) permits a court to void action taken in violation of the law.

In any event, Robert Ralph, a director of HHI, addressed the Town Board on February 26, 1980, at a public hearing held to secure comments on the Town's 1980–81 CDBG application. He filed a document that purported to be a proposed amendment to the Town's zoning ordinance, which requested "a commitment by the Town to amend the zoning ordinance to allow multi-family rental construction by a private developer." Between February 26, 1980 and August 1980, when HHI applied for section 8 funds for Matinecock Court, there was no substantive communication between HHI and Supervisor Butterfield or any other member of the Town Board.

■ The court concludes that HHI never filed an application to rezone its option property to R–3M status. On cross-examination, Garvin testified as follows:

Q Now, did anybody, in fact, ever file a rezoning application form at Matinecock Court?

A No.

Q At any time?

A No.

Q When you became executive director of Housing Help, did you learn of the general nature of the comprehensive master plan of the town of Huntington?

A Not at that time, no.

Q Did you learn anything about the master plan at any time before February 22, 1980?

A No.

Q Did you know that there was a master plan?

A I don't remember at what point I became aware of that.

Q Did you ever meet with the Director of Planning of the town of Huntington at any time during your entire tenure as Executive Director of Housing Help?

A No.

Tr. 1116.

On cross-examination, Ralph testified about the unofficial meeting of February 22, 1980 and his understanding of zoning procedures:

Q Did you think it was perfectly proper to meet with a majority of the Town Board members in closed session which was not previously advertised to the public?

A It never occurred to me that there was any problem with that.

I would think if there was a problem they would have brought it to our attention.

Q You didn't think there was a problem?

A I was not aware of any problem.

Q Were you familiar with the rezoning procedures in Huntington before you went to that meeting?

A That's we needed for—

Q No. I am asking—

A No, I should say no.

Q Did you know there was such a thing of [sic] zoning application form with instructions that was issued by the tone [sic] of Huntington that was in existence and in use at that time?

A I don't believe I was.

Tr. 1994–95.

In light of the court's conclusion that plaintiffs never applied for rezoning, it follows that plaintiffs have failed to make out a *prima facie* case. As discussed earlier, the Second Circuit has construed the second of the four *McDonnell Douglas* factors, in the context of a title VIII action, as a showing "that [plaintiff] applied for and was qualified to rent or purchase the housing." *Robinson, supra,* 610 F.2d at 1038. *Mutatis mutandis,* the requirement in this action would be a showing that plaintiffs applied for a zoning change. That showing has not been made; therefore, plaintiffs' title VIII claim must fail.

But even if the court were willing to assume that a rezoning application had been made, in substance if not in form, the conclusion would be the same: plaintiffs are not entitled to relief on their title VIII claim. The Town urges the court to find, assuming plaintiffs had applied for rezoning, that a *prima facie* case still had not been made out, because there was no showing of a discriminatory effect, let alone discriminatory intent. Although the court is not in full agreement with defendants' characterization of the evidence, the court is persuaded that plaintiffs have not made out a *prima facie* case or, alternatively, if they made out a *prima facie* case, it was rebutted by an articulation of legitimate, non-discriminatory reasons for the Town's acts and omissions—reasons that have not been shown to be pretextual. To summarize, there are three alternative reasons that plaintiffs' title VIII claim fails:

(1) There was no application for a zoning change, so the second *McDonnell Douglas* element is missing and there is no *prima facie* case;

(2) Under the four-factor analysis of *Arlington II,* plaintiffs have not made out a *prima facie* case; and

(3) Even if plaintiffs have made out a *prima facie* case, it has been rebutted by legitimate, nondiscriminatory reasons that have not been exposed at pretextual.

The court has explained the basis for its first alternative holding; what follows is a discussion of the second and third alternative holdings.

The second alternative holding—that plaintiffs have not made out a *prima facie* case under the four-part test of *Arlington Heights II*—is not predicated upon a total agreement with defendants' view of the evidence, but rather upon a view of the evidence as a whole. Thus, the court does not believe, as defendants argue, that plaintiffs have failed utterly to show a discriminatory effect. The evidence adduced by plaintiffs showed that the Town has a shortage of rental housing affordable for low- and moderate-income households and that a disproportionately large percentage of the households using subsidized rental units for families in Huntington are minority citizens. In this connection, it is relevant that 74% of those on the waiting list for Gateway Gardens are members of minority groups, as are 45% of those on the Lincoln Manor waiting list and 61% of those on the waiting list for existing section 8 certificates. While it is true that no one can predict with absolute certainty what the racial composition would have been at Matinecock Court, had the project been built, the evidence supports a finding that a significant percentage of the tenants would have belonged to minority groups.

Having said that the construction of Matinecock Court would have provided housing accommodation for members of minority groups, the court is constrained to observe that the showing is not overwhelm-

ingly strong. This is the first factor of *Arlington Heights II:* how strong is the showing of discriminatory effect? The showing is not particularly strong because the population of those with incomes at or below 200% of the poverty level, within the Town, consisted of 22,160 white persons and 3671 black, Hispanic, and Asian persons, according to the 1980 census. To qualify for service by the Huntington Housing Authority, one had to have an income at or below 185% of the poverty level. The statistics regarding those at or below 200% provide a fairly close approximation of the ratios that would be found at 185% and demonstrate that the beneficiaries of low- and moderate-income housing might not come disproportionately from minority groups. Nor do the waiting lists for Lincoln Manor, Gateway Gardens, and section 8 existing certificates provide a fool-proof barometer of the likely population of Matinecock Court.

Turning to the second factor of *Arlington Heights II*—evidence of discriminatory intent—the court notes that this is the least important of the four factors, and has been read out of the test entirely by the Sixth Circuit in *Arthur v. City of Toledo, Ohio, supra.* But to the extent that discriminatory intent is a factor, it cuts in favor of the defendants.

For one, the court has found that there was no formal application for a zoning change, which leads to the conclusion that the failure to rezone for Matinecock Court was not motivated by discriminatory intent. What is more, plaintiffs have been unable to show that the Town had a history of perpetuating segregation by confining subsidized housing to the Huntington Station area. Plaintiffs have not proved a segregative intent or effect in connection with the establishment of Gateway Gardens or Whitman Village, or the rehabilitation of the Lincoln School. Nor is there persuasive proof that enactment or implementation of the zoning code has perpetuated segregation or been motivated by discriminatory impulses. The same may be said of the Town's policy regarding section 8 existing and rehabilitation programs.

In a discrimination action, a court cannot be satisfied that the absence of overtly discriminatory remarks proves an absence of discrimination. Yet it is worthy of at least some note that there has been no serious contention that any member of the Town Board made racist remarks. This is by no means a suggestion that findings of discrimination can be avoided by careful use of code words. Rather, the court observes that people who wish to discriminate often slip from using code words into saying what they are thinking. That, at least, did not happen here. In short, the flavor of the evidence and the demeanor of the witnesses did not give rise to an aura of discriminatory intent.

The third factor of *Arlington Heights II* is the defendant's interest in taking the action of which plaintiff complains. The court finds that defendants' acts and omissions with respect to the zoning process and housing in general were supported by rational and legitimate concerns. In addition to several of the facts discussed earlier, which tend to show that defendants' decisions were made for good reasons, the court notes that the Town is approximately 90% developed, and there is not much leeway any longer for radical change in the face of the real estate. In his October 14, 1980 letter to HUD, recommending rejection of the Matinecock Court project, Supervisor Butterfield listed seven reasons that the project should not be built: (1) inconsistency with the Town's Housing Assistance Plan; (2) inconsistency with zoning; (3) traffic considerations; (4) site plan problems; (5) proximity to the railroad and Long Island Lighting Company substation; (6) inadequate recreation and play areas; and (7) undersized and unrealistic units. It would beg the question to assert the first two stated reasons in the context of deciding whether or not the Town's HAP and zoning ordinance violated title VIII. But the other five reasons were supported by the evidence and do provide legitimate, nondiscriminatory reasons for the Town's conduct. In other words, the court believes that defendants have shown a strong interest in pursuing the course of conduct that they followed.

The fourth *Arlington Heights II* factor cuts in favor of plaintiffs, because they did not ask the Town affirmatively to provide housing, only to permit housing to be built. But the court determines that the first three factors in this four-part test weigh sufficiently in defendants' favor to support the second alternative holding, i.e., that, even assuming a rezoning application had been made, plaintiffs failed to make out a *prima facie* case.

■ It could be argued, however, that a weighing of the four *Arlington Heights II* factors would support a conclusion that plaintiffs established a *prima facie* case. If so, the court's third alternative holding still compels a judgment in favor of the defendants. This is because the Town has shown legitimate, nondiscriminatory reasons for its conduct, and those reasons have not been exposed as pretextual. The basis for this finding is evident in the court's discussion of its first two alternative holdings, and will not be repeated here. It suffices to say that even if plaintiffs are deemed to have made a rezoning application, and even if the facts and circumstances are then such as to state a *prima facie* case, that case has been rebutted successfully by the defendants, who were faced with numerous policy considerations and reached their decisions for legitimate reasons.

In light of the foregoing conclusions, it is not necessary to detail the reasons that plaintiffs' claims under the equal protection clause and 42 U.S.C. §§ 1982 and 1983 fall short of the mark. For these claims, the standard of proof is as high as it is under title VIII, *see Selden Apartments v. HUD*, 785 F.2d 152, 159 (6th Cir.1986), or higher, *see Washington v. Davis, supra*. The judgment for defendants on the title VIII claim forecloses relief for plaintiffs on the other federal claims.

■ Remaining is the claim that defendants violated the New York Town Law and *Berenson v. Town of New Castle, supra*. This claim, too, must fail. In *Berenson*, the New York Court of Appeals stated:

> In determining the validity of an ordinance excluding multi-family housing as a permitted use, we must consider the general purposes which the concept of zoning seeks to serve. The primary goal of a zoning ordinance must be to provide for the development of a balanced, cohesive community which will make efficient use of the town's available land. By balanced, we do not mean to imply that a community must maintain a certain quantitative proportion between various types of development. Clearly, such a requirement would rub against one of the basic purposes of zoning, which is to provide in an orderly fashion for actual public need for various types of residential, commercial and industrial structures.
>
> Similarly, the town is free to set up various types of use zones. There is no requirement that each zone must contain some sort of housing balance. Our concern is not whether the zones, in themselves, are balanced communities, but whether the town itself, as provided for by its zoning ordinances, will be a balanced and integrated community. *Thus ... if a district is set aside for multiple-dwelling development, there is no requirement that other portions of a town contain such developments.*

38 N.Y.2d 102, 109–10, 341 N.E.2d 236, 241–42, 378 N.Y.S.2d 672, 680 (1975) (citations omitted; emphasis added).

In light of the findings made by the court on plaintiffs' federal claims, there can be little question as to the outcome of the *Berenson* claim. Simply put, the Town has "provided a properly balanced and well ordered plan for the community," as required by the first part of the *Berenson* test, *id.* at 110, 341 N.E.2d at 242, 378 N.Y.S.2d at 680, and it has given sufficient consideration to "regional needs and requirements," *id.*, 341 N.E.2d at 242, 378 N.Y.S.2d at 681.

More recently, the court of appeals has dealt with an attack on the implementation of a zoning ordinance, whereas *Berenson* involved a facial attack. *Suffolk Housing Services v. Town of Brookhaven*, 70 N.Y.2d 122, 130, 511 N.E.2d 67, 70, 517 N.Y.S.2d 924, 926 (1987). Against the

background of findings of fact that the defendant had not caused the claimed housing shortage, *id.*, 511 N.E.2d at 70, 517 N.Y.S.2d at 926, the court "decline[d] to take the legislative action urged by plaintiffs in the context of this lawsuit," *id.* at 132, 511 N.E.2d at 71, 517 N.Y.S.2d at 927. The same reasoning applies here: inasmuch as the court has found that the Town's plan is properly balanced and well ordered, and sufficiently considers regional requirements—if anything, Huntington has been a leader in providing public housing in Suffolk County—the Town's zoning ordinance survives facial attack and is not infirm as applied, either.

### IV. *Conclusion*

The problems associated with providing housing for low- and moderate-income persons in contemporary suburbs are not susceptible of easy resolution. The law commands the extirpation of racial discrimination in housing, as it does in employment, education, voting rights, and other aspects of life. But this command does not imply that everyone will be able to live where he or she chooses, because there are competing considerations of economics and space that often make impossible that which is desirable. The court has no doubt of the sincerity of plaintiffs, as individuals and as organizations, in their attempt to improve housing opportunities for residents of Huntington and its environs. The court is compelled to conclude, however, that plaintiffs have failed to prove a violation by defendants of either federal or state law. Accordingly, the clerk is directed to enter judgment in favor of defendants, but with no costs to either side, Fed.R.Civ.P. 54(d). The foregoing constitutes the court's findings of facts and conclusions of law. *Id.* 52(a).

SO ORDERED.